IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **JUDY GAY HESS,** | ) | |
| Plaintiff | ) | Civil Action No. 1:20cv00064 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | By: Pamela Meade Sargent |
| **Acting Commissioner of Social** | ) | United States Magistrate Judge |
| **Security,** | ) | |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Judy Gay Hess, ("Hess"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Hess protectively filed an application for DIB on January 15, 2019, alleging disability as of January 15, 2019, due to nerves; severe anxiety; severe depression; memory loss; comprehension loss; panic attacks; and severe leg pain and swelling. (Record, ("R."), at 10, 157-58, 194, 218.) The claim was denied initially and on reconsideration. (R. at 97-99, 104-11.) Hess then requested a hearing before an administrative law judge, ("ALJ"). (R. at 113-14.) A hearing was held on July 29, 2020, at which Hess was represented by counsel. (R. at 37-69.)

By decision dated August 24, 2020, the ALJ denied Hess's claim. (R. at 10-26.) The ALJ found Hess met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 12.) The ALJ found Hess had not engaged in substantial gainful activity since January 15, 2019, the alleged onset date. (R. at 12.) The ALJ determined Hess had severe impairments, namely, anxiety disorder and obsessive-compulsive disorders; personality disorder; affective disorder; obesity; and osteoarthritis of the knees and hips, but he found Hess did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12-13.) The ALJ found Hess had the residual functional capacity to perform

medium[2] work, except she could sit, stand and walk up to six hours each in an eight-hour workday; she could occasionally operate foot controls, bilaterally; she could occasionally climb, balance, stoop, kneel, crouch and crawl; she could occasionally work at unprotected heights, around moving mechanical parts, extreme cold and around vibration; she could perform simple routine one-to-two step tasks in two-hour blocks; and she could occasionally interact with supervisors and co-workers. (R. at 15.) The ALJ found that Hess could not perform any of her past relevant work. (R. at 24.) Based on Hess's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Hess could perform, including the jobs of a dietary aide, an order picker and a dining room attendant. (R. at 24-25, 63-64.) Thus, the ALJ concluded Hess was not under a disability as defined by the Act from January 15, 2019, through the date of the decision, and she was not eligible for DIB benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Hess pursued her administrative appeals, (R. at 151-53, 263-66), but the Appeals Council denied her request for review. (R. at 1-5.) Hess then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Hess's motion for summary judgment filed June 21, 2021, and the Commissioner's motion for summary judgment filed July 20, 2021.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2021).

## II. Facts[3] and Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its

---

[3] Based on the following findings, I will not address the evidence pertaining to Hess's mental impairments.

judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Hess was born in 1959, (R. at 24, 51), which, on the alleged onset disability date, classified her as a "person of advanced age" under 20 C.F.R. § 404.1563(e), and on the date of the ALJ's decision, classified her as a "person closely approaching retirement age" under 20 C.F.R. § 404.1563(e). She has a high school education and past work experience as an assistant manager and a store manager.[4] (R. at 48-50, 63, 195.) Hess stated she walked five days a week and performed exercises to help with her knee pain. (R. at 52.) She stated that, after walking, she was very tired and had to sit and many times had to go back to bed. (R. at 52.)

Records from Wellmont Medical Associates show Hess was treated from 2015 through 2018 for various ailments, including gastroesophageal reflux disease, ("GERD"); memory loss; depressive disorder; dizziness; bilateral hip pain; pelvis pain; dyslipidemia; hyperlipidemia; Meniere's disease[5] of both ears; Helicobacter pylori; mitral valve disorder; and anxiety disorder. (R. at 291-93.) On examination, Hess was fully oriented with a normal mood and affect; her speech and behavior were normal; she had normal range of motion in her extremities, including her right

---

[4] The vocational expert classified these jobs as light, skilled work. (R. at 63.)

[5] Meniere's disease is a disorder of the inner ear that can lead to dizziness (vertigo), ringing in the ears (tinnitus), hearing loss and a feeling of fullness or congestion in the ear. *See* https://www.nidcd.nih.gov/health/menieres-disease (last visited Sept. 16, 2022).

hip, which also had normal strength and no tenderness or swelling; she had normal reflexes, sensation and muscle tone with no atrophy; and her coordination and gait were normal. (R. at 303, 306, 318.)

In January, May and September 2019, Hess saw Eleanor E. Hess, F.N.P., a family nurse practitioner with Wellmont Medical Associates, ("Nurse Hess"), for depression and hyperlipidemia, and her hyperlipidemia was reported as controlled. (R. at 294, 298, 520.) Hess's joints were unremarkable, she denied weakness and other neurological symptoms. (R. at 295, 299, 523.) On examination, Hess was fully oriented with a normal mood and affect; her speech and behavior were normal; she had normal range of motion in her extremities, including her right hip, which also had normal strength and no tenderness or swelling; she had normal reflexes and muscle tone with no atrophy; and her coordination and gait were normal. (R. at 296, 299-300, 524.)

On August 2, 2019, Dr. Joseph Familant, M.D., a state agency physician, found that Hess's physical examinations showed treatment for high cholesterol, reflux and general illnesses but overall normal examinations and studies. (R. at 86-87.) He also noted the record did not document leg swelling edema, etc. (R. at 87.) Thus, he found Hess did not suffer from a severe physical impairment. (R. at 87.) Dr. Familant, however, did not make a finding as to Hess's residual functional capacity.

On January 23, 2020, Hess saw Nurse Hess, and reported bilateral hip and knee pain with muscle weakness and hand pain and weakness with her right middle finger locking. (R. at 495-96.) On examination, Hess was fully oriented with a normal mood and affect; her speech, behavior, judgment and thought content were

normal; she had normal range of motion in her extremities, including her right shoulder, both hips and knees, which also had normal strength and no tenderness or swelling; her right middle finger locked at the proximal interphalangeal, ("PIP"), joint; she had normal strength, reflexes and muscle tone with no atrophy; she had no nerve or sensory deficits; and her coordination and gait were normal. (R. at 498-99.) Based on her complaints of knee pain and her knees giving away, x-rays of Hess's knees were ordered. (R. at 501.)

On January 31, 2020, Hess saw Travis Patton, P.A., a physician's assistant at Blue Ridge Orthopedics and Sports Medicine, ("Blue Ridge"), for evaluation of her right hand and bilateral knee pain. (R. at 573.) She stated she experienced triggering sensation of the right middle finger and had difficulty gripping items. (R. at 573.) Hess reported difficulty transitioning from seated to standing and ambulating for long periods of time. (R. at 573.) Hess's right hand had no edema, erythema or ecchymosis; she had tenderness at the base of the middle finger; she had triggering sensation to full flexion and a hypertrophic nodule; she had good grip strength; she was neurovascularly intact; her knees had mild edema and hypertrophic changes through the medial aspect of her knees; and she had equal range of motion and motor strength. (R. at 574.) X-rays of Hess's right hand were normal. (R. at 574.) X-rays of Hess's knees revealed at least 25 percent joint space and mild degenerative changes. (R. at 574.) Patton diagnosed trigger finger of the right middle finger and mild bilateral knee pain, and he administered an injection to Hess's right middle finger. (R. at 574.)

On March 13, 2020, Hess saw Jessica L. Plonk, P.A., a physician's assistant at Blue Ridge, and reported that she was doing very well. (R. at 571-72.) She stated the steroid injection of her trigger finger completely resolved her pain and range of

motion. (R. at 571.) Hess also reported significant improvement with her knee pain since starting Mobic and the only difficulty she experienced was climbing stairs. (R. at 571.) Hess was alert and fully oriented; her mood and affect were appropriate; her right hand had no tenderness, full range of motion and intact sensation; her knees had no tenderness to palpation and full range of motion; she had no ligamentous instability; and her legs were neurovascularly intact. (R. at 571-72.) Treatment options for Hess's osteoarthritis were discussed, and Hess was continued on Mobic. (R. at 572.)

On May 26, 2020, Hess saw Nurse Hess, and reported left knee pain. (R. at 589.) On examination, Hess was fully oriented with a normal mood and affect; her speech, behavior, judgment and thought content were normal; she had normal range of motion in her extremities; she had normal strength, reflexes and muscle tone with no atrophy; she had no nerve or sensory deficits; and her coordination and gait were normal. (R. at 592.) Among other things, Hess's diagnosis included sarcopenia,[6] and locking finger joint. (R. at 593.)

On May 27, 2020, Hess saw Patton for left hip and knee pain. (R. at 578.) She stated she recently started her walking routine outside and she had been walking on a treadmill over the winter. (R. at 578.) Hess was fully oriented and in no acute distress; her mood and affect were appropriate; her left knee had minimal tenderness along the medial aspect and pes anserine area but no edema, erythema or ecchymosis; she had good range of motion; she had good quadriceps and hamstrings strength; she was neurovascularly intact; she had mild tenderness along the hip with normal range of motion; and she had good motor strength in all directions. (R. at

---

[6] Sarcopenia is the age-related progressive loss of muscle mass, strength and function. *See* https://my.clevelandclinic.org/health/diseases/23167-sarcopenia (last visited Sept. 16, 2022).

579.) X-rays of Hess's left hip revealed the femoral head sat anatomically of the acetabulum. (R. at 581.) Patton diagnosed left hip greater trochanteric bursitis and left knee pain; pes anserine bursitis; and osteoarthritis of the knee. (R. at 579.) Conservative treatment and home exercises were recommended for Hess's knee and hip pain. (R. at 579.)

On June 3, 2020, Hess saw Nurse Hess, and reported hypertension and muscle pain, joint swelling and stiffness in her bilateral upper extremities, bilateral hips, left knee and right elbow. (R. at 615.) Hess had tenderness and lateral epicondyle tenderness in her right elbow, but she had normal range of motion; she had tenderness in her left hip, but she had normal range of motion and normal strength; she had tenderness in both knees; and she had a trigger finger. (R. at 618.) Hess was diagnosed with myalgia; trigger finger of the right hand, unspecified finger; lateral epicondylitis of the right elbow; sarcopenia; and lateral epicondylitis[7] of the right elbow. (R. at 613, 619.)

On June 4, 2020, Nurse Hess completed a Clinical Assessment Of Pain, indicating pain affected Hess's ability to adequately perform work or daily activities; walking, standing and bending "greatly" increased her pain, which caused her to abandon tasks; and medication impacted her work ability with some limitations, but did not create serious work problems. (R. at 554.)

---

[7] Lateral epicondylitis, also known as Tennis Elbow, is a painful condition involving the tendons that attach to the bone on the outside part of the elbow. With lateral epicondylitis, there is degeneration of the tendon's attachment, weakening the anchor site and placing greater stress on the area. This can lead to pain associated with activities, such as lifting, gripping and/or grasping. *See* https://www.assh.org/handcare/condition/tennis-elbow-lateral-epicondylitis (last visited Sept. 16, 2022).

That same day, Nurse Hess completed an Arthritis Medical Source Statement, indicating that Hess had impaired sleep, reduced grip strength, muscle weakness and tenderness based on multiple joint and muscle pain. (R. at 555-58.) She found Hess could walk one city block without rest or severe pain; she could sit up to one hour without interruption; she could stand 30 minutes without interruption; she could sit a total of four hours in an eight-hour workday;[8] she needed to walk every 30 minutes for five minutes; she could lift and carry items weighing 10 pounds frequently and 20 pounds occasionally; she had significant limitations in her ability to finger; and she would be absent about four days a month. (R. at 558.)

Hess argues the ALJ erred by failing to find that she was disabled under Rule 201.06 or 202.06 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2, ("the Grids"). (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 3-6.) Hess also argues the ALJ erred by failing to properly evaluate the opinions of Dr. Moffet and McFadden, and, thus, failed to find she suffered from disabling mental impairments. (Plaintiff's Brief at 7.) She further argues the ALJ erred by improperly substituting his opinion for that of trained medical professionals. (Plaintiff's Brief at 8.) Finally, Hess argues the ALJ erred by finding her activities of daily living were inconsistent with disability. (Plaintiff's Brief at 8-9.)

Hess filed her application in January 2019; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[9] When making a

---

[8] Nurse Hess did not indicate the total time Hess could stand/walk in a workday. (R. at 556.)

[9] 20 C.F.R. § 404.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819

residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. § 404.1520c(a) (2021). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1) (2021). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2) (2021). The ALJ is not required to explain the consideration of the other three factors, including relationship with the

---

(Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

claimant, specialization and other factors such as an understanding of the disability program's policies and evidentiary requirements.[10] *See* 20 C.F.R. § 404.1520c(b)(2).

Hess argues the ALJ erred by failing to find that she was disabled under Rule 201.06 or 202.06 of the Grids. (Plaintiff's Brief at 3-6.) Hess contends the record shows that her physical symptoms supported an inability to tolerate more than sedentary[11] work activity. (Plaintiff's Brief at 5-6.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found Hess had the residual functional capacity to perform medium work, except she could sit, stand and walk up to six hours each in an eight-hour workday; she could occasionally operate foot controls, bilaterally; she could occasionally climb, balance, stoop, kneel, crouch and crawl; she could occasionally work at unprotected heights, around moving mechanical parts, extreme cold and around vibration; she could perform simple routine one-to-two step tasks in two-hour blocks; and she could occasionally interact with supervisors and co-workers. (R. at 15.)

---

[10] An exception to this is when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(b)(3) (2021).

[11] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a) (2021).

In making this residual functional capacity finding, the ALJ stated he found Nurse Hess's opinion unpersuasive. (R. at 20-21.) Nurse Hess opined Hess could lift and carry items weighing 10 pounds frequently and 20 pounds occasionally and she had significant limitations in her ability to finger. The ALJ noted he did not assess any reaching or manipulative limitations because Hess's trigger finger disorder improved with treatment and she had full strength and range of motion over the hands, and she received no treatment for right shoulder pain. (R. at 21.) The record does show that, in March 2020, Hess reported the steroid injection of her trigger finger completely resolved her pain and range of motion; however, by June 2020, she complained of bilateral upper extremity pain, and Nurse Hess noted she had a trigger finger of the right hand with tenderness and lateral epicondyle tenderness in her right elbow. In addition, Hess was diagnosed with sarcopenia.

The ALJ found Hess could perform unskilled, medium work. As noted above, the regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. *See* 20 C.F.R. 404.1567(c). According to Social Security Ruling 83-10, in most medium jobs, being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift items weighing up to 50 pounds at a time. *See* Social Security Ruling, ("S.S.R."), 83-10, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 1983), 1983 WL 31251, *6 (Jan. 1, 1983). Furthermore, most medium jobs require the use of the arms and hands to grasp, hold and turn objects. S.S.R. 83-10, 1983 WL 31251, *6. While the ALJ mentioned Hess's trigger finger disorder and right shoulder, he did not address the recurrence of her trigger finger disorder, the lateral epicondyle tenderness in her right elbow or her diagnosis of sarcopenia, all of which could affect Hess's ability to lift, grip or grasp. As noted above, the state agency physician found that Hess did not have a severe physical

impairment and he failed to make a finding as to Hess's residual functional capacity. The record does not contain any other evidence discussing Hess's work-related physical limitations. Based on this, I cannot determine that substantial evidence exists to support the ALJ's finding that Hess had the residual functional capacity to perform medium work.

The court notes that Hess's residual functional capacity is particularly important because, should she be limited to less than medium work, she could be found disabled. The vocational expert classified Hess's past work as light, skilled work and the ALJ found she was limited to medium, unskilled work. (R. at 15, 24, 63.) Under the regulations, individuals of advanced age who can no longer perform their past relevant work and who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work within their functional capacity and who is limited to light work warrant a finding of disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(c).

The vocational expert testified that a hypothetical individual of Hess's age, education and work history, who would be limited to light work would have transferrable skills. (R. at 65.) Reduced residual functional capacity and advancing age are important factors associated with transferability because a reduced functional capacity limits the number of jobs within an individual's physical or mental capacity to perform, and advancing age decreases the possibility of making a successful vocational adjustment. *See* S.S.R. 82-41, 1982 WL 31389, *5 (Jan. 1, 1982). The vocational expert further stated that, "with any job to which any of [Hess's] skills would transfer would have a big adjustment." (R. at 65.) He also stated that, the jobs that Hess's skills would transfer to would have a "learning curve to it." (R. at 66.) "For a finding of transferability of skills to light work for persons of advanced age

-14-

who are closely approaching retirement age (age 60 or older), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.00(f). Based on this, I do not find that substantial evidence exists to support the ALJ's finding that Hess was not disabled.

Given the deficiencies in the ALJ's analysis of the medical evidence, combined with the applicable rules as transferability of skills, I do not find substantial evidence exists to support the ALJ's finding as to Hess's residual function capacity and his ultimate finding that she was not disabled and not entitled to DIB benefits. Based on this finding, I will not address Hess's remaining arguments.

An appropriate order will be entered remanding this case to the Commissioner for further consideration.

DATED:    September 16, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE